## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JON E. CRABTREE,                           :

    Plaintiff,                         :
                                    Case No. 3:10cv00458

 vs.                                       :

                                      District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                         :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                   :

    Defendant.                         :

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Jon E. Crabtree brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). This Court has jurisdiction to review the administrative denial of his applications. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #8), and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff asserted in administrative proceedings that he is eligible to receive DIB and SSI because he is under a "disability" within the meaning of the Social Security Act. In the present case, Plaintiff seeks a reversal of the ALJ's decision, and a remand of this case to the Social Security Administration for payment of benefits.  The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.    BACKGROUND

### A.    <u>Procedural History</u>

Plaintiff filed his SSI and DIB applications in April 2007, asserting that he has been under a "disability" since February 27, 2003.  (Doc. #8, *Page ID##* 180-82, 183-90). Plaintiff claimed to be disabled by herniated and bulging discs, depression, and anxiety. (*See* Doc. #8, *Page ID#* 243).

Following initial administrative denials of his applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) Amelia G. Lombardo.  ALJ Lombardo later issued the written decision concluding that Plaintiff was not under a disability, and, therefore, not eligible to receive SSI or DIB.  (Doc. #8, *Page ID##* 42-60).

### B.    <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 40 years old on the date the ALJ issued her decision, which defined him as a "younger individual."  *See* 20 C.F.R. §§ 404.1563; 416.963[2]; *see also* Doc. #8, *Page ID##* 58, 271.  Plaintiff has a 10th grade, "limited" education, in the "slow learners"

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

class. *See* 20 C.F.R. §404.1564(b)(3); *see also* Doc. #8, *Page ID#* 248. He has past

relevant work experience as a skid/pallet builder. (Doc. #8, *Page ID##* 244, 250-57).

Plaintiff testified at the administrative hearing[3] that he is 6'1" and weighs 180

pounds. (Doc. #8, *Page ID#* 70). He lives in a one-floor apartment with his girlfriend,

his son, her three children, and her father. (*Id.*). His girlfriend's father drove him to the

hearing. (*Id.*). He has never had a driver's license because he has trouble reading. (Doc.

#8, *Page ID#* 71). Plaintiff next testified that he attended high school through the 9th or

10th grade. (*Id.*). He testified that he attended special education classes in school. (*Id.*).

He noted he left school because of anxiety and depression from being around a lot of

people and because his parents moved. (*Id.*). He said he did not go to another school

after he dropped out. (*Id.*). After his parents moved to Troy, Ohio, he said he could not

remember if he was enrolled in school there. (Doc. # 8, Page ID # 79). Plaintiff testified

that since he had a concussion he sometimes forgets things. (*Id.*).

Plaintiff testified that he can read basic things but cannot read a newspaper. (Doc.

#8, *Page ID#* 72). He said he sits all day, but does try to get up and move around. (*Id.*).

He does not watch much TV. (*Id.*). He said his ex-wife supported him, and at the time of

the hearing his girlfriend took care of him financially. (*Id.*). Plaintiff testified that he

built pallets and skids in all of his jobs. (Doc. #8, *Page ID#* 73). While he was working,

something happened to his back and he fell. (*Id.*). He was taken to the hospital in an

---

[3]Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony
also presented at the administrative hearing, the Court has not summarized that testimony.

ambulance and was told that he has as large herniated disc on the right side of his back. (*Id.*). The reason he has not worked anywhere else is because of back pain, and nervousness around people. (*Id.*). Plaintiff also testified that he has COPD, chronic bronchitis and has to use inhalers. (Doc. #8, *Page ID#* 74). Plaintiff said he smokes one and a half packs of cigarettes a day. (*Id.*). Plaintiff said he has a problem being around a group of people and becomes nervous and scared. (*Id.*). He said he has had no drug or alcohol problems for five or six years. (*Id.*).

Plaintiff reported that he had been seen for pain management, has received one steroid injection in his back (has two more remaining), and was currently receiving physical therapy. (Doc. #8, *Page ID#* 75). He takes pain medication that he receives from his pain management doctor but the medications make him tired. (*Id.*). He said his pain medication was switched and it has helped him. (*Id.*).

Plaintiff estimated that he can walk one block with a cane, but he has to stop and start. (Doc. #8, *Page ID##* 75-76, 78). He later testified that he could walk a couple of blocks with his cane without stopping. (Doc. #8, *Page ID#* 78). He said he can stand for five to ten minutes but he is off balance and his legs go out from under him. (Doc. #8, *Page ID#* 76). He said if he stands for that length of time his pain will go from his back down into his right leg and that leg goes numb. (Doc. #8, *Page ID#* 80). He estimated that he can sit for 20 to 30 minutes but he needs to move around. (Doc. #8, *Page ID#* 76). Plaintiff said he has carpel tunnel syndrome in his hands, which hurt, become stiff, and

will not bend.  (*Id.*).  He said he drops things easily.  (*Id.*).  Plaintiff testified that his

doctor told him not to lift more than five to ten pounds at a time.  (Doc. #8, *Page ID#* 77).

Plaintiff testified that he tries to help with the dishes and "stuff."  (Doc. #8, *Page ID#* 77).  He said he "somewhat" helps his girlfriend's father care for the children while his girlfriend is at work.  (*Id.*).  He testified that he uses a cane that was prescribed by his doctor for balance and stability.  (Doc. #8, *Page ID#* 78).  Plaintiff testified that his girlfriend has to help him dress and put on his socks and shoes because he might fall if he bends that far.  (Doc. #8, *Page ID#* 79).  His girlfriend does everything around the house.  (Doc. #8, *Page ID#* 80).  Plaintiff testified that he saw a surgeon who said back surgery would not work because there was too much nerve damage and he waited too long.  (Doc. #8, *Page ID##* 80-81).  The surgeon said he would have only a 50-50 chance of getting better.  (*Id.*).  Plaintiff testified that laying down makes his back hurt as well.  (Doc. #8, *Page ID#* 81).  He would have to use his cane all the time, would be unable to use one hand to work, would have to stand up after sitting for only a short time, and his back would go out if he lifted anything.  (*Id.*).  He uses a recliner and places a pillow between his legs.  (Doc. #8, *Page ID#* 82).  He lays down two to three hours in an eight-hour time frame, and lays down a total of four to five hours out of each day.  (*Id.*).  If he lifts too much he will become stuck in a hunched-over position.  (Doc. #8, *Page ID#* 83).

C.  <u>Medical Record and Opinions</u>

1.  **Physical Impairments**

5

EMG testing conducted by physical medicine and rehabilitation specialist, James B. Hoover, M.D., in February 2001, showed minimal bilateral carpel tunnel syndrome with no radiculopathy, polyneuropathy, or ulnar nerve injury.  (Doc. #8, *Page ID##* 418-19).

An MRI of Plaintiff's lumbar spine taken in January 2002 revealed leftward disc bulging at L3-L4 and L4-L5, central disc bulging at L4-L5, and disc herniation on the right side at L5-S1 pressing upon the nerve root.  (Doc. #8, *Page ID##* 407-08).

Plaintiff presented to the emergency room at Upper Valley Medical Center on November 17, 2003, for back pain.  (Doc. #8, *Page ID##* 334-36).  Examination revealed a full range of motion in his back, with some pain upon palpitation.  (Doc. #8, *Page ID#* 335).  He had a full range of motion in his extremities, full strength, and no sensory or motor deficits.  (*Id.*).  He was given medication and discharged in good condition.  (Doc. #8, *Page ID#* 336).  Plaintiff presented to the emergency room after falling and hitting his head in July 2004.  (Doc. #8, *Page ID##* 337-41).  He had full range of motion, full strength throughout his body, and no pain on palpitation about the cervical, thoracic, or lumbosacral spine.  (Doc. #8, *Page ID#* 338).  The emergency room physicians found no evidence of subdural or epidural hematoma, or injury to the neck area.  They also found no ringing in his ears or change in hearing acuity, or other evidence to suggest labyrinthitis.  (*Id.*).  In August 2004, Plaintiff was seen in the emergency room for gastritis, "probably as a result of his drinking heavily for the last 4 to 5 days."  He

admitted to drinking daily and was diagnosed with alcohol abuse.  (Doc. #8, *Page ID##* 342-45).

In October 2006, Stephen W. Duritsch, M.D., examined Plaintiff on behalf of the Ohio Bureau of Disability Determination ("BDD").  (Doc. #8, *Page ID##* 366-73). Plaintiff described an onset of low back pain in 1997, but no specific event associated with the onset of his symptoms.  He reported he could drive a short distance, do light housework and yard work, and that he had been out of work since 1997.  (Doc. #8, *Page ID#* 366).  While Plaintiff had a cane, Dr. Duritsch wrote its use was "not obligatory" since he walked just as well when he was not using the cane and did not put any significant weight on it.  (Doc. #8, *Page ID#*  367).  Plaintiff had "give-way" weakness upon many tests, which demonstrated poor effort.  (*Id.*).  Dr. Duritsch reported "[t]he give-way weakness in the lower limbs does not all match physiologic of what I observe with simple ambulation.  He has normal ability to ambulate."  (*Id.*).  Plaintiff also reported he had carpal tunnel syndrome and that he often dropped things.  (Doc. #8, *Page ID#*  366).  Dr. Duritsch observed that "grip strength is inconsistent with poor effort. . . . There is no abnormality in writing, holding coffee cup, zippering, unbuttoning, opening jars, or picking up coins.  He is able to perform both of these activities bilaterally."  (Doc. #8, *Page ID#*  367).  Dr. Duritsch concluded that "[t]he hallmark of this individual's exam is lack of objective findings. . . . I cannot establish any objective or meaningful limitation in sitting, walking, lifting, carrying objects, handling objects, hearing, speaking or traveling."  (*Id.*).  Dr. Duritsch also took x-rays of Plaintiff's lumbar spine which were normal.  (Doc. #8, *Page ID#* 373).

7

Plaintiff saw Dr. Hoover again in September 2007.  (Doc. #8, *Page ID##* 414-15).
He complained of constant pain in the low back, which goes in the right lower extremity
down to the foot.  Plaintiff also complained of tingling in both legs and numbness in both
hands.  His fingers turn white at times.  He has intermittent swelling and heat in the right
lower extremity.  He has had a recent lower extremity EMG that was negative.  (Doc. #8,
*Page ID#* 417).  Examination revealed tenderness to light palpation without excessive
curves in the spine and "give-way" strength.  Plaintiff complained of pain, but was able to
complete a straight leg raise test.  (Doc. #8, *Page ID#* 415).  Dr. Hoover ordered further
diagnostic tests, but noted that if they came back negative, he thought Plaintiff may have
a "chronic benign pain syndrome."  (*Id.*).  A whole body bone scan did not reveal any
abnormalities.  (Doc. #8, *Page ID#* 403).  An MRI of the lumbar spine taken in October
2007, showed a large disc herniation at L4-L5, and a tiny amount of Schmori node
formation at T12-L1.  (Doc. #8, *Page ID##* 404-05).  When seen by Dr. Hoover in
October 2007, Plaintiff complained of numbness in his hands and pain up his arms, but
upon examination, he had full range of motion in his hands and wrists bilaterally, with
"no obvious focal weakness," and no atrophy.  (Doc. #8, *Page ID##*  412-13).

Plaintiff began treating with Certified Nurse Practitioner Carla Christine Garber
("CNP Garber") in September 2007.  (Doc. #8, *Page ID#* 455).  In January 2008, two
doctors called in prescriptions for Vicodin to the same pharmacy.  Plaintiff denied he
tried to get narcotics from two sources and stated it was a mix-up at the pharmacy.  CNP

8

Garber noted that she would not prescribe Vicodin to Plaintiff in the future.  (Doc. #8, *Page ID#*  453).

Eli Perencevich, D.O. reviewed the record on behalf of the Ohio BDD in November 2007.  (Doc. #8, *Page ID##* 428-35).  Dr. Perencevich opined that Plaintiff could lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds frequently; and stand and/or walk and also sit about six hours each in an eight-hour workday.  (Doc. #8, *Page ID#* 429). Dr. Perencevich noted that Plaintiff had only had conservative treatment, relatively mild abnormalities, and that no doctor had recommended back surgery.  (Doc. #8, *Page ID##* 429-30). Dr. Perencevich recommended occasional postural limitations, such as stooping and crawling, and no climbing ladders, ropes or scaffolds.  (Doc. #8, *Page ID#* 430).

In May 2008, CNP Garber prescribed a cane for Plaintiff due to "lumbar disk herniation at L4-L5."  (Doc. #8, *Page ID#*  449).  Plaintiff complained of back pain and wanted Percocet or Vicodin, but when CNP Garber would not prescribe it for him due to the previous mix-up, Plaintiff stated "then don't order me anything!"  (Doc. #8, *Page ID#* 447).  Plaintiff also stated that he missed an appointment at Dayton Pain Clinic because he "did not have pain at that time."  (*Id.*).  CNP Garber further noted in this clinical record that Plaintiff complained that "no one does anything for me," but CNP Garber responded that she could help if Plaintiff were willing to put forth some effort on his part.  (*Id.*).

9

In June 2008, CNP Garber completed a medical source statement.  (Doc. #8, *Page ID##* 436-44).  She opined Plaintiff could sit four hours in a work day, stand or walk 15 minutes, and that he would need to rest four hours per work day.  (Doc. #8, *Page ID##* 436-38).  She did not think Plaintiff would be capable of lifting any weight at all, nor did she think Plaintiff was able to balance, stoop, reach to shoulder height or overhead, handle objects or use foot controls.  (Doc. #8, *Page ID##* 438-41).  CNP Garber opined that Plaintiff would need to use a cane for walking and balancing at all times, and that he could only work for 30 minutes per day.  (Doc. #8, *Page ID##* 441-43).  CNP Garber based Plaintiff's restrictions on chronic back pain and L4-L5 disk herniation.  (Doc. #8, *Page ID#* 443).

Plaintiff began treating with pain specialist, Pranitha Nalamada, M.D., in January 2009.  (Doc. #8, *Page ID#* 419).  Dr. Nalamada diagnosed right herniated nucleus pulposus at L4-5, lumbar radiculopathy and chronic low back pain.  Physical therapy and a series of three steroid injections were recommended.  (*Id.*).  In March 2009, Plaintiff received the first steroid injection in his back.  (Doc. #8, *Page ID#* 509).

In September 2009, when seen in the emergency room for a cough, he was told that he needed to stop smoking.  (Doc. #8, *Page ID##* 464-75).  When seen by CNP Garber that same month, she also told Plaintiff to quit smoking and told him "he would have nothing but problems unless he quit."  (Doc. #8, *Page ID#* 486).  On September 22, 2009, CNP Garber completed another medical source statement with the same conclusions as noted in January 2008.  (Doc. #8, *Page ID##* 477-85).

10

In October 2009, Plaintiff reported that pain was "well controlled" with medications, his pain was at level 2 of 10, and he was not experiencing any fatigue. (Doc. #8, *Page ID#* 495).

### 2.    Mental Impairments

Plaintiff saw a mental health counselor for three months in 2004.  (Doc. #8, *Page ID##* 346-53).  He was diagnosed with alcohol-induced anxiety during withdrawal.  (*Id.*).

In October 2006, Plaintiff was examined by Alan Boerger, Ph.D., on behalf of the Ohio BDD.  (Doc. #8, *Page ID##* 359-65).  Plaintiff reported he was seeing a counselor but was not taking any medication for any mental impairments.  (Doc. #8, *Page ID#* 360). Plaintiff also reported that he quit his job due to his back problems and because of "problems being around people."  (*Id.*).  He denied ever being fired.  (*Id.*).  He reported that he had to go to anger management classes in the past because of a domestic violence charge.  (Doc. #8, *Page ID#* 361).  His affect was appropriate, but Plaintiff reported that he suffered from depression in the past, and had anxiety being around people.  (*Id.*). Based on the results of cognitive functioning exams, Dr. Boerger concluded Plaintiff had "borderline to low average range level intellectual abilities."  (Doc. #8, *Page ID#* 362). Plaintiff scored a verbal IQ of 72, a performance IQ of 70, and a full scale IQ of 69. (Doc. #8, *Page ID#* 363).  Dr. Boerger noted that while his full scale IQ was at the upper end of mild retardation, his educational background and general work history suggests that he has functioned as an individual with at least borderline range level intellectual abilities.  (*Id.*).  Dr. Boerger diagnosed anxiety disorder, alcohol abuse, borderline

11

intellectual functioning, and assessed a Global Assessment of Functioning (GAF) score of 52.  (Doc. #8, *Page ID#* 365).  Dr. Boerger opined that Plaintiff had moderate impairments in his ability to: relate to others; understand and follow instruction; maintain attention to perform simple repetitive tasks; and withstand the stress and pressures associated with day-to-day work activity.  (*Id.*).

In June 2007, the file was reviewed by Karen Stailey-Steiger, Ph.D., on behalf of the Ohio BDD.  (Doc. #8, *Page ID##* 385-402).  Dr. Stailey-Steiger concluded Plaintiff would have mild functional limitations in the areas of activities of daily living; moderate limitations maintaining social functioning; moderate limitations maintaining concentration, persistence or pace; and he had no episodes of decompensation.  (Doc. #8, *Page ID#* 395).  Dr. Stailey-Steiger concluded Plaintiff was "capable of performing simple routine tasks in a more solitary environment."  (Doc. #8, *Page ID#* 401).  In November 2007, Marianne Collins, Ph.D., affirmed Dr. Stailey-Steiger's assessment. (Doc. #8, *Page ID#*  421).

## III.   ADMINISTRATIVE REVIEW

### A.   <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough

12

to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. Social Security Regulations

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence; *See* Doc. #8, *Page ID##* 43-44; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

13

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

C.   **ALJ Lombardo's Decision**

At Step 1 of the sequential evaluation, ALJ Lombardo found that Plaintiff has not engaged in substantial gainful activity since February 27, 2003, the alleged onset date. (Doc. #8, *Page ID#* 46).

The ALJ found at Step 2 that Plaintiff has the severe impairments of lumbar degenerative disc disease; borderline intellectual functioning; anxiety; and depression. (*Id.*).

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (Doc. #8, *Page ID#* 47).

At Step 4 the ALJ concluded that Plaintiff retained the residual functional capacity[4] (RFC) to perform light exertional work subject to the following additional limitations: occasional stooping and crawling; alternate between sitting and standing every 30 minutes; simple routine tasks; low stress work; minimal contact with groups. (Doc. #8, *Page ID#* 51).

The ALJ concluded at Step 4 that Plaintiff was unable to perform his past relevant work as a skid/pallet builder.  (Doc. #8, *Page ID#* 58).

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Security*, 276 F.3d 235, 239 (6th Cir. 2002).

At Step 5, based on the vocational expert's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given his age, education, work experience, and RFC.  (*Id.*).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (Doc. #8, *Page ID#* 59).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Security*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     DISCUSSION

### A.     <u>Plaintiff's Contentions</u>

Plaintiff contends that the ALJ interpreted Plaintiff's testimony improperly and made findings and conclusions which are not supported by the evidence or otherwise ignored significant positive evidence.  (Doc. # 10 at 11).  Plaintiff also argues that the ALJ failed to weigh the opinions of CNP Garber and consulting psychologist, Dr. Boerger, as required by the Regulations.  (*Id.*).  Plaintiff further contends that the ALJ erred by failing to find Plaintiff's physical and mental impairment equaled Listing §§ 12.05C and 1.04.

### B.     <u>Listing § 12.05C</u>

The Regulations explain the criteria for mental retardation in § 12.05 of the Listings:

The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).

If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.  Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations.  For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.  Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

12.05  *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

The regulations provide that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and one of the four sets of criteria...." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted).

C.    <u>**Analysis**</u>

**1.**

In her decision, the ALJ noted that the "[e]xamining psychologist Dr. Boerger found that the claimant has a verbal IQ of 72, a performance IQ of 70, and a full-scale IQ of 69" but nonetheless determined the IQ scores to be "invalid," and the requirements in paragraph C of Listing § 12.05 not to have been met.  (Doc. #8-2, *PageID#* 50).  In reaching this conclusion, the ALJ relied on the fact that Dr. Boerger "diagnosed [Plaintiff] with borderline intellectual function, not mental retardation."  (*Id.*).  The ALJ also considered that "Dr. Boerger said that the claimant's memory problems and low test scores may be the result of anxiety as he demonstrated general work knowledge, visual organization of abstract material, and the ability to perform arithmetic problems involving simple multiplication and the addition and subtraction of three-digit numbers."  (*Id.*).  In addition, the ALJ noted that "Dr. Boerger concluded that the claimant would be able to manage his own benefits in his own best interest."  (*Id.*).  Such facts, however, are insufficient to support the ALJ's conclusion that Plaintiff's IQ test scores are invalid.

In *Brown v. Secretary of Health & Human Services*, the United States Court of Appeals for the Sixth Circuit determined the plaintiff, Mr. Brown's, IQ score of 68 to be valid and his abilities to be within the DSM-III-R's [5] diagnosis of mild mental retardation corresponding to an IQ between 50-55 and 70.  The Court of Appeals explained:

---

[5] Diagnostic and Statistical Manual of Mental Disorders, 3rd ed., Revised

> Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at the grocery store; he can do his own laundry and clean his room; he has completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove.

*Brown v. Secretary of Health & Human Services*, 948 F.2d 268, 269-70 (6th Cir. 1991).

The Court of Appeals further explained that individuals with mild mental retardation

> [b]y their late teens . . . can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress.  At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Brown*, 948 F.2d at 270 (quoting DSM-III-R § 317.00).   Here, the ALJ provided no description of functional abilities possessed by the Plaintiff that are inconsistent with mild mental retardation, nor does the record show such abilities exist.  For example, Plaintiff started receiving failing grades in the 6th grade; did not complete the 10th grade; does not cook, clean, do laundry or outdoor work; has never had a driver's license; has trouble reading; and has past work as a skid/pallet builder.  (*See* Doc. #8-7, *Page ID##* 359-65; Doc. # 8-6, *Page ID##* 291-95).

  While it was not improper for the ALJ to question the validity of scores from an IQ test, *see* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00D(6)(a), the ALJ erred because her determination that the IQ test scores were invalid was not supported by substantial evidence.  Again, the abilities of the Plaintiff referenced by the ALJ were not inconsistent

19

with mild mental retardation, no other IQ tests were performed,[6] and the record lacks evidence from any medical source finding the scores invalid.  The lack of a diagnosis of mental retardation similarly does not invalidate the IQ test scores.

The Commissioner's reliance on *Daniels v. Comm'r of Social Security*, 70 Fed. Appx. 868 (6th Cir. 2003) is also misplaced.  In *Daniels*, the ALJ did not invalidate IQ test scores and then rely on this fact to find the plaintiff not mentally retarded.  Instead, the ALJ in *Daniels* found the plaintiff not to be mentally retarded because, *despite* valid IQ test scores, there were no findings in the record "that Plaintiff suffered from 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.'"  *Id.* at 872.  Thus, the ALJ in *Daniels* found the plaintiff was not mentally retarded because she failed to meet the diagnostic description of mental retardation in the introductory paragraph of Listing § 12.05, not because she failed to have a valid IQ test score.  Here, the ALJ never analyzed whether Plaintiff met the diagnostic description of Listing § 12.05 because she essentially stopped her analysis after determining the IQ test scores were invalid.

*Daniels* is also distinguishable because, as the Court of Appeals noted, the record in that case shows "Plaintiff graduated from high school, earned a cosmetology license, and possesses prior work experience in a movie theater, as a hair stylist, and as a school bus driver; i.e., her educational background and work experience demonstrate an 'ability

---

[6] *See Brown*, 948 F.2d at 270 ("We also note that the Secretary could have administered a second IQ test were he certain of the invalidity of Mr. Brown's scores. He did not.").

to perform relatively complicated tasks.'" *Id.* at 873.  (citing *Foster*, 279 F.3d at 355).

Plaintiff's educational background and work experience in this case are significantly

different than that of the plaintiff in *Daniels*.  Here, Plaintiff did not pass the 10th grade,

received years of failing grades in school, and worked as a skid/pallet builder for most of

his life.

In *Daniels* it was also noted that "the Plaintiff has not provided any evidence, as

required, that her mental deficiency initially manifested before age 22."  *Id.*  Here,

Plaintiff has provided academic records showing failing grades as early as 6th grade.

(Doc. #8-6, *Page ID## 291-95*).  In fact, Plaintiff's records in 7th grade indicate he was

"Placed in Grade 8," and his 8th grade records indicate he was "Placed in Grade 9."  (Doc.

#8-6, *Page ID## 214-15*) (emphasis in original).  Thereafter, he never made it past the

10th grade.  His academic records also indicate he was marked as "L.D." (presumably

standing for "Learning Disabled") in 5th grade, and underwent a psychological evaluation

in 4th grade.  (Doc. #8-6, *Page ID# 292*).  Yet, it appears the ALJ overlooked these facts

when she concluded "there is no evidence that the claimant went through special

education classes." (Doc. # 8-2, *Page ID# 50*).  Nonetheless, even if the ALJ's conclusion

was correct, such a fact, despite the ALJ's apparent indication otherwise, would not

preclude Plaintiff from being able to show "deficits in adaptive functioning" before the

age of 22.  Although evidence a claimant took special education courses while in school

may be highly assistive in determining whether a claimant shows "deficits in adaptive

functioning" before the age of 22, this Court is unaware of, and the Commissioner has not

21

cited to, any authority *requiring* a claimant show he or she was a special education student in order to meet the requirements of the diagnostic description in Listing § 12.05. Moreover, it is important to note that "adaptive functioning" does not solely relate to a claimant's academic record.  *See West v. Comm'r Social Security*, 240 Fed. Appx. 692, 698 (6th Cir. 2007) ("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills.") (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993)).  Nonetheless, the ALJ never considered these facts because she invalidated the IQ test scores and provided no meaningful analysis relating to Listing § 12.05C after that point.

**2.**

In addition to requiring "[a] valid verbal, performance, or full scale IQ of 60 through 70," paragraph C of Listing § 12.05 also requires a claimant to have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. § 404, Subpt. P, App. 1 § 1205.  Although the regulations do not define "additional and significant work-related limitation of function," they "do suggest, however, that 'significant' is comparable to 'severe.'" *Findlay v. Heckler*, 735 F.2d 1363 (6th Cir. 1984).

According to the ALJ, "the claimant's anxiety and depression do not result in significant work-related functional limitations."  (Doc. #8-2, *Page ID#* 50).  The ALJ erred, however, because such a conclusion is not supported by substantial evidence.

22

In fact, the ALJ concluded herself, and this Court agrees, that Plaintiff's anxiety

and depression are "severe" within the meaning of the Social Security Act:

> After careful consideration of the evidence of record, it is found that the claimant has sufficiently established by substantial evidence that he has the following documented impairments: lumbar degenerative disc disease; borderline intellectual function; anxiety; and depression. These impairments result in functional limitations that affect his ability to do basic work-related functions. Such impairments are "severe" within the meaning of the Social Security Act. There is no substantial evidence of any other physical or mental impairment that is "severe."

(Doc. #8-2, *Page ID#* 47). Furthermore, it is somewhat paradoxical that the ALJ, in

invalidating the IQ test scores, relies heavily on Dr. Boerger's assessment that Plaintiff's

"low test scores may be the result of anxiety," yet also finds that anxiety (and depression)

"do not result in significant work-related functional limitations." (Doc. #8-2, *Page ID#*

50).

### 3.

The ALJ also erred by failing to consider whether Plaintiff had a *physical*

impairment "imposing an additional and significant work-related limitation of function."

Again, paragraph C of Listing § 12.05 requires, in addition to "[a] valid verbal,

performance, or full scale IQ of 60 through 70," that a claimant has "a physical **or** other

mental impairment imposing an additional and significant work-related limitation of

function." 20 C.F.R. § 404, Subpt. P, App. 1 § 1205 (emphasis added). Thus, it was error

for the ALJ not to consider whether Plaintiff possessed any physical impairments that

impose any "additional and significant work-related limitation of function."

23

Again, the ALJ erred because she improperly invalidated the Plaintiff's IQ test scores, incorrectly determined that Plaintiff's mental impairments did not impose "an additional and significant work-related limitation of function," failed to consider whether Plaintiff had any physical impairments imposing "an additional and significant work-related limitation of function," and limited any consideration as to Plaintiff's "deficits in adaptive functioning" before the age of 22, strictly to evidence of participation in special education classes.  Despite the Commissioner's contentions otherwise, these errors were not harmless.  *See Reynolds v. Comm'r Social Security*, 424 Fed. Appx. 411, 416 (6th Cir. 2011) ("The ALJ's error was not harmless . . . . In short, the ALJ needed to actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.") (internal citations omitted).

For all of the above reasons, Plaintiff's Statement of Errors is well taken.[7]

## VI.     REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous

---

[7] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Although the evidence shows that Plaintiff has a valid full scale IQ score of 69, more is required to meet or equal Listing § 12.05C. *See Foster*, 279 F.3d at 354 ("[A] claimant will meet the listing for mental retardation only 'if [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph **and** any one of the four sets of criteria . . . .'") (internal citations omitted) (emphasis in original). Evidence indicating Plaintiff satisfies the diagnostic description in Listing § 12.05C is not overwhelming, nor strong while contrary evidence is weak.

To satisfy the diagnostic description in the introductory paragraph of Listing § 12.05C, a claimant must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, . . . before age 22." 20 C.F.R. § 404, Subpt. P, App. 1 § 1205. Here, the ALJ did not determine whether evidence provided by Plaintiff was sufficient to satisfy the diagnostic description in Listing § 12.05. Accordingly, on remand, at Step 3 of the newly performed five-Step sequential analysis, the ALJ must determine whether the evidence provided by Plaintiff demonstrates or supports a finding that the claimant has "significantly

25

subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, . . . before age 22." (*Id.*).

Due to the problems discussed above, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g).  On remand the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for SSI and DIB should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and,

4.    The case be terminated on the docket of this Court.


January 30, 2012                                        s/ Sharon L. Ovington
                                                   Sharon L. Ovington
                                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).